James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

Adam C. Paul, P.C. (*pro hac vice* pending)
Catherine Jun (*pro hac vice* admission pending)
Gerardo Mijares-Shafai (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | § Chapter 15 |
| NOBLE GROUP LIMITED, | § Case No. 18-[_____] (___) |
| Debtor in a Foreign Proceeding.[1] | |

**DECLARATION OF FOREIGN REPRESENTATIVE
PURSUANT TO 11 U.S.C. § 1515 AND RULE 1007(a)(4)
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IN
SUPPORT OF THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Paul J. Brough, to the best of my information and belief, state as follows:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration based upon my own personal knowledge except for those portions specified as being otherwise. I am making this declaration (the "Declaration") in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] The last four digits of Noble Group Limited's overseas company number are 5268. The mailing address of Noble Group Limited's corporate office is Noble Group Limited, 11th floor, 33 Cavendish Square, Marylebone, London W1G 0PW United Kingdom.

2.  I am the Executive Chairman of the Board of Noble Group Limited ("Noble" or the "Debtor"),[2] the above-captioned debtor, a company incorporated under the laws of Bermuda. In such capacity, I am familiar with the Debtor's businesses, day-to-day operations, and financial affairs. This Declaration has been drafted to support: (a) the official form chapter 15 petition (the "Form Petition") for the Debtor; and (b) the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition," and together with the Form Petition, the "Chapter 15 Petition").

3.  This Declaration begins with a discussion of Noble's businesses and corporate structure. In addition, the Declaration summarizes Noble's capital structure and restructuring efforts. Finally, the Declaration provides an update regarding the current status of the English Proceedings.[3]

## Background

### I.  The Debtor's Businesses and Corporate Structure.

4.  Based upon information I have gathered in my role as Executive Chairman of Noble, I can confirm that Noble, together with its controlled and affiliated companies (collectively, the "Noble Group" or the "Company"), has been in operation since 1986 and, today, is one of the world's largest commodity traders by volume. The Debtor, Noble, maintains its corporate office in London, England, and is listed on the Singapore Exchange Limited ("SGX").

---

[2] For the avoidance of doubt, Noble refers only to Noble Group Limited, and not to any of its subsidiaries or any consolidated entity.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in either the Verified Petition or the explanatory statement of the Schemes (the "Explanatory Statement," attached as Exhibit B to the Verified Petition, both of which have been contemporaneously filed herewith. To the extent any of the descriptions herein conflict with those provided in the Explanatory Statement, the Explanatory Statement shall control in all respects.

2

5. Noble Group is a supply chain manager in physical commodities; that is, it provides participants along the supply chain with the knowledge and expertise to help limit price risk and non-delivery risk inherent in moving commodities between markets and seeks hedging and price arbitrage opportunities in the financial commodities markets through financially-settled derivatives. In summary, Noble Group then provides to its customers (a) logistics and transportation services, (b) price risk management and hedging services, and (c) structured and trade financing. The Debtor, Noble, functions as the ultimate holding company of Noble Group, holding shares in a number of intermediate holding companies incorporated in several jurisdictions including Bermuda, the British Virgin Islands, Singapore, and Hong Kong, which in turn own shares in additional holding companies and operating companies in various jurisdictions. Noble's principal roles are to direct strategy for Noble Group, issue debt, and perform treasury functions with respect to the use of cash throughout Noble Group. As such, all major sources of funding for Noble Group's functions were incurred by Noble and on-lent to other members of Noble Group. Noble's financial obligations are governed under the laws of several jurisdictions, including England and New York state.

6. Noble Group divides its business operations into two primary segments: (a) Energy (the "Energy Business"); and (b) Metals, Minerals, and Ores (the "MMO Business").

   a. Energy Business: Noble Group's Energy Business transacts in two groups of energy commodities: energy coal and liquefied natural gas ("LNG"). The energy coal business is a leading global franchise consisting of a balanced portfolio of trading, marketing, and supply chain management services. It primarily deals with physical thermal coal sourced predominantly from Indonesia and Australia based on long-term coal offtake and marketing contracts. Such coal is usually sold to end-user coal-fired power plants located throughout Asia. At its core are long-term relationships and partnerships with both producers and consumers, through which Noble Group manages the product flows and also provides supply chain and risk management services to customers.

3

    Noble Group's LNG franchise focuses on trading and providing supply chain and risk management services in seaborne LNG, while building out its portfolio of existing relationships with Asian energy customers and developing longer term contracts in the emerging markets.

  b. <u>MMO Business:</u> Noble Group's MMO Business transacts in two groups of industrial products: non-ferrous metals and carbon steel materials. Noble Group is a leading participant in the non-ferrous metals market, sourcing from producers worldwide through long and short-term offtake agreements and marketing arrangements, then distributing these products to industrial consumers. Furthermore, Noble Group's carbon steel materials business provides raw materials to the steel manufacturing industry; particularly iron ore, chrome ore and concentrate, manganese ore, metallurgical coal, and metallurgical coke.

    The MMO business also includes Noble Group's freight business. This business services external customers, as well as Noble Group's internal freight requirements, with modern ocean transport in the dry bulk segment. This business provides both internal and external customers with long-term freight solutions and market guidance.

## II. Noble's Capital Structure.[4]

7. I can confirm that as of June 30, 2018, Noble has approximately $3.85 billion[5] in funded indebtedness. As of the Petition Date, this consists of: $2.306 billion in principal amount of indebtedness due under the Existing Notes; $1.143 billion in principal amount of indebtedness under the Existing RCF Loans; and $400 million in principal amount of perpetual capital securities.

8. I can also confirm that Noble's common stock is traded on the SGX under the ticker symbol "CGP." As of the Petition Date, Noble had approximately 1,327.5 million outstanding ordinary shares.

## III. Events Leading Up to the Restructuring.

9. From 2014 through early 2017, Noble Group faced an industry-wide fall in commodity prices and a corresponding reduction in the availability of bank and other financing

---

[4] The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

[5] All figures are in United States dollars.

sources as lenders reduced their exposure to the sector. In addition to reduced access to financing, Noble Group suffered downgrades from credit rating agencies and a resulting increased cost of financing of its physical commodities trading.

10. Specifically, for the financial years ended December 31, 2013, 2014, 2015, and 2016, Noble Group had reported declining earnings of profit/(loss) for the respective financial years of approximately $238.5 million, $132.5 million, $(1.7) billion and $8.1 million. In particular, in 2015, Noble Group reported a net loss of $1.7 billion, including non-cash asset impairments and write-downs in the accounting value of its long-term physical commodity contracts. In early 2016, Noble Group lost its investment grade credit rating, causing Noble Group's financing arrangements to become increasingly more restrictive, via additional financial covenants and higher costs. In the first quarter of 2017, Noble Group reported a $129.5 million loss. Market and lender reactions to this loss led to further challenges for Noble Group in managing and supporting its supply chain activities. These faltering results severely weakened the confidence of Noble Group's financiers, trading counterparties, suppliers, and customers, and demonstrated how Noble Group's financial health impacts the willingness of its financiers and counterparties to transact with Noble Group on competitive terms. With this loss in confidence came significant downgrades in Noble Group's credit rating and a dramatic decrease in access to capital, with any available capital being available only at high cost. This created an acute issue for a business that is highly dependent on trade finance and hedging facilities to operate.

11. In response to these challenges, Noble commenced a strategic review in May 2017 and retained Kirkland & Ellis LLP and Moelis & Company ("Moelis") to provide restructuring advice and engage in negotiations with its lenders. The strategic review included managing Noble's short-term liquidity challenges and formulating a plan for a turnaround of its business.

5

The broad objective of the review was to reduce indebtedness, sell assets, and focus Noble Group on its core hard commodities, freight, and LNG businesses, where it has a leading position in Asia. In the months that followed, Noble Group negotiated covenant waivers and extensions under several of its debt facilities, thereby staving off default and enabling the Company to pursue the orderly disposal of certain businesses.

12. As part of the review, Noble also engaged Moelis and Morgan Stanley to assist with reviewing various strategic alternatives. Noble further engaged PJT Partners (UK) Limited and Comprador Limited as financial advisors in connection with the proposed Restructuring. In furtherance of the strategic review, Noble took steps to sell its North American gas and power business and global oil liquids business, which together were expected to generate significant cash proceeds and allow Noble Group to retire certain secured borrowing base revolving credit facilities. Additionally, the sale of its North American gas and power business and its global oil liquids business was announced in July 2017 and October 2017, respectively.

13. In spite of the sales, Noble Group's operations continued to deteriorate, with Noble Group reporting a total net loss of $4.9 billion for the year ended December 31, 2017. The loss included further write-downs in the accounting value of Noble Group's long-term physical commodity contracts—reflecting reserves and valuation adjustments to account for increased risks relating to Noble Group's operating environment, trading terms, and current access to financing.

14. In anticipation of these losses, the Debtor commenced discussions in October 2017 with members of Noble's creditor groups who had formed into an ad hoc group of Existing Senior Creditors for the purpose of formulating and negotiating restructuring proposals with Noble (as such group is constituted from time to time, the "Ad Hoc Group"). Concurrently, Noble and its advisors explored certain offers received by Noble from third parties with regard to potential

strategic investments or sales of certain Noble Group assets. However, Noble never received a binding proposal with respect to any such potential investment or acquisition. Further, Noble and its advisors ultimately concluded that these offers were highly conditional, subject to detailed due diligence and lengthy regulatory approvals, and came with no assurance of interim adequate trade finance facilities at competitive terms. Hence, Noble continued to negotiate with the Ad Hoc Group and certain other Existing Senior Creditors the terms of a broader restructuring (as defined and discussed in detail in the Explanatory Statement, the "Restructuring") without allowing the offers to impair such negotiations.

**IV.    Restructuring Negotiations and the Restructuring Support Agreement.**

15.    An in-principle agreement with the Ad Hoc Group was announced on January 29, 2018 to restructure the Existing Senior Claims (the "Initial Proposal"). On February 19, 2018, Noble announced that further to the Initial Proposal, it had reached an in-principle agreement with the Ad Hoc Group and ING Bank N.V. (as a fronting bank, "ING") for the provision of a three-year committed $700 million trade finance facility to be made available to New Noble in the event that the Restructuring is successful.

16.    On March 14, 2018, Noble announced that it had entered into the Restructuring Support Agreement ("RSA") with both the Ad Hoc Group and Deutsche Bank AG ("DB"), which was one of the Fronting Banks, Existing Trade Finance Providers, and Existing Senior Creditors in connection with the proposed Restructuring. On March 27, 2018, ING, as one of the Fronting Banks, Existing Trade Finance Providers, and Existing Senior Creditors, acceded to the RSA. On April 16, 2018, Noble announced that Existing Senior Creditors representing over 83 percent of the Existing Senior Claims had acceded to the RSA. Among other things, the RSA, which is governed by English law, provides for a moratorium on all enforcement action by acceding creditors against Noble. The RSA was subsequently amended on September 28, 2018 to extend

the moratorium to November 27, 2018. I can confirm that as of the Petition Date, approximately 88 percent of the holders of Existing Senior Debt Instruments have acceded to the RSA in support of the Restructuring. In addition, the Restructuring has been approved by 99.96 percent of Noble's shareholders, as formally recognized by a vote of the shareholders on August 27, 2018.

17. In addition to approving the Restructuring, the independent shareholders agreed to waive their rights, under Singapore law, to receive a mandatory general offer from the Senior Creditor SPV (the "Whitewash Waiver"), which is necessary because: (a) the Restructuring calls for the transfer of substantially all of Noble's assets to New Noble and transfer of the listing status from Noble to New Noble; and (b) as a result of the Restructuring, Senior Creditor SPV shall hold 70% of the shares in New Noble. Importantly, the Securities Industry Council in Singapore (the "SIC") made its approval of the Whitewash Waiver conditional upon Noble completing the Restructuring by November 27, 2018. My understanding, based on advice from Singapore counsel, is that it is not aware of the SIC ever granting extensions to this type of condition. The Board resolutions approving the proposed Restructuring and Whitewash Waiver therefore expire on November 27, 2018. There is no guarantee that Noble will be able to again obtain such consensus from its shareholders, or extension from the SIC, once the resolutions expire. Thus, November 27, 2018 effectively serves as the deadline by which the Restructuring transactions must be consummated.

18. As contemplated in the RSA, the Restructuring, (a) restructures and manages the maturities of Noble's borrowings to optimize the use of available cash for the foreseeable future; and (b) treats all stakeholders fairly. Broadly speaking, the Restructuring calls for:

      a.    the transfer of substantially all of Noble's assets to newly incorporated subsidiaries of a new Bermuda holding company, Noble Group Holdings Limited ("New Noble").

      b.    the separation of New Noble's assets into two silos. The Trading Co Group will operate New Noble's core businesses, consisting of hard commodities, freight, and LNG businesses located primarily in the Asia-Pacific region, while the Asset Co Group will hold New Noble's interests in Harbour Energy, Jamalco, Noble Plantations, and certain vessels.

      c.    the provision of new trade finance and hedging facilities to the subsidiaries of New Noble in an amount of $800 million, being the aggregate of sums advanced under the terms of the New Trade Finance Facility and the New Hedging Support Facility (which together make up the New Money Debt) and the Increase Trade Finance Facility.

      d.    the release by Scheme Creditors of their Scheme Claims in return for an entitlement to be issued with a combination of, (i) various new debt instruments (described in more detail below) and (ii) equity in a newly-incorporated company (the "Senior Creditor SPV" as defined herein).

      e.    the offer of an exchange solicitation to the Existing Perpetual Capital Securities Holders, which will give all such holders the right to transfer their securities for a *pro rata* share of $25 million of perpetual capital securities to be issued by New Noble, provided that the Existing Perpetual Capital Securities Holders have passed an extraordinary resolution with a requisite majority of not less than 75 percent of votes cast at a duly convened meeting.

19.    To effectuate the Restructuring with respect to the Scheme Claims, the RSA contemplates two inter-conditional schemes of arrangement under section 99 of the Companies Act 1981 of Bermuda (the "Bermudan Scheme") and Part 26 of the Companies Act 2006 of England and Wales (the "English Scheme," and together with the Bermudan Scheme, the "Schemes"), with the English Scheme as the primary proceeding to restructure Noble's funded debt. Importantly, entry of an order recognizing the English Proceedings and granting the relief requested in the Verified Petition is a condition precedent to the consummation of the Restructuring.

9

**V.      Description of the Schemes.**

20.     The Schemes contemplate compromise of the claims (the "Scheme Claims") held by two classes of Scheme Creditors. The first class comprises holders of the following financial indebtedness:

- the 2018 Notes, which are governed by English law, issued by Noble, and constituted pursuant to the Existing 2018 Notes Trust Deed, and of which $379,000,000[6] in aggregate principal amount was outstanding as of September 21, 2018;

- the 2020 Notes, which are governed by New York law, issued by Noble, and constituted pursuant to the Existing 2020 Notes Indenture, and of which $1,176,920,000 in aggregate principal amount was outstanding as of September 21, 2018;

- the 2022 Notes, which are governed by English law, issued by Noble, and constituted pursuant to the Existing 2022 Notes Trust Deed, and of which $750,000,000 in aggregate principal amount is outstanding as of September 21, 2018; and

- the Existing RCF Loans under the $2,294,600,000 revolving credit facility agreement, governed under English law, dated May 18, 2015, between, among others, Noble as borrower, the Existing RCF Lenders, and Madison Pacific Trust Limited as agent and swingline agent, as amended pursuant to amendment letters dated August 2, 2017 and December 19, 2017, and as further supplemented, amended and restated from time to time.

In addition, the first class of Scheme Creditor includes any persons whatsoever that hold any Claim other than a claim in respect of the Existing Senior Debt Instruments or an Excluded Claim (the "Other Scheme Claims").

21.     The second class under the Scheme is composed of DB with respect to the DB Excluded Claim and the DB Surplus Claim.

22.     All Scheme Creditors (except for DB with respect to the DB Excluded Claim) will be entitled to receive a *pro rata* share of new trade finance and hedging facilities to be issued by

---

[6]     All figures are in United States dollars.

10

certain subsidiaries of New Noble and equity in New Noble (held via the Senior Creditor SPV), as follows:

- **Priority Debt Exchange**: For each $1,000 of qualifying Scheme Claims held by a Participating Creditor (*i.e.*, a Scheme Creditor that agrees to risk participate in a new first lien trade finance facility (the "New Trade Finance Facility")), such Participating Creditor shall be entitled to $1,000 of Tranche B New Asset Co Bonds or New Trading Co Bonds, as applicable, in a particular ratio, provided, however, that if the aggregate of such accepted Scheme Claims exceeds the specified cap, then a pro rata allocation.

- **Further Debt Exchange**: Following the Priority Debt Exchange, each qualifying Scheme Creditor shall be entitled to an amount of New Trading Hold Co Bonds (*i.e.*, notes to be issued by a newly-created holding company within the Trading Co Group).

- **Debt for Equity Swap**: Following the Further Debt Exchange, each qualifying Scheme Creditor shall be entitled to a *pro rata* share of stock in the Senior Creditor SPV, which, in turn, will own approximately 70 percent of the equity in New Noble.[7]

23. With respect to the DB Excluded Claim, DB will be the sole recipient of certain priority bonds to be issued by the primary operating company within the Asset Co Group. This different treatment of the DB Excluded Claim arises as a result of DB's continued trade finance support leading up to the Restructuring, without which Noble could not function. ING, also a trade financier, will also receive certain priority bonds as part of the Restructuring pursuant to a separate agreement outside of the Schemes.[8]

24. The Schemes also provide releases to those parties essential to the implementation of the RSA and the Restructuring. Specifically, as of the Restructuring Effective Date, each Scheme Creditor (i) waives, releases, and discharges each and every claim which it ever had, may

---

[7] *See* Verified Petition, Ex. B, Part B, Clauses 9.10-9.14. In addition to the transfer of new debt and equity, the Restructuring includes several additional steps, as further detailed in the Explanatory Statement. *See* Verified Petition, Ex. B, Part B, Clauses 9.15-9.22.

[8] Alternatively, another person may receive these priority bonds in exchange for an amount equal in cash to the ING Claim.

have or hereafter can, shall or may have against the Released Parties for any Liability in respect of the preparation, negotiation, sanctioning or implementation of this Scheme and/or the Restructuring; and (ii) agrees not to commence or continue, or instruct, direct or authorize any other person to commence or continue, any Prohibited Proceedings in respect of or arising from any Scheme Claims or any Liability in respect of: (a) the preparation, negotiation and sanctioning of the English Scheme, the Restructuring and the Restructuring Documents; and (b) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms.[9]

25.   The releases are an integral part of the Schemes and the broader restructuring.

**VI.   The English Proceedings.**

26.   On September 21, 2018, Noble notified its creditors via the Practice Statement Letter of its intention to propose the English Scheme, explain the objectives that the English Scheme is designed to achieve, and apply to the English Court for leave to convene creditor meetings to consider and vote on the English Scheme (the "English Scheme Meetings"). On October 9, 2018, Noble filed such application with the English Court under Part 26 of the Companies Act 2006 of England and Wales (the "Companies Act"). The English Court, which is is located in London, considered that application at a hearing (the "Convening Hearing") held over two days starting on October 12, 2018. On October 16, 2018, the English Court issued an order (the "Convening Order") which, among other things: (i) ordered the convening of the English Scheme Meetings on November 8, 2018; (ii) ordered that notice of the English Scheme Meetings, together with the Explanatory Statement and proxy forms for voting at the English Scheme Meetings, be made available to all those the Debtor believes are or may be Scheme Creditors; and

---

[9]   *See* Verified Petition, Ex. B, Part F, Clause 12.2; Ex. B, Appx. 11.

(iii) authorized the appointment of the Foreign Representative to act as a foreign representative in this chapter 15 case.[10]

27. It is my understanding that following the English Scheme Meetings, and upon receiving the necessary votes in favor of the English Scheme from the Scheme Creditors, the English Court will conduct the English Scheme Sanction Hearing on November 12, 2018 to consider approving the English Scheme.[11]

## VII. The Bermudan Proceedings.

28. Noble is pursuing the separate Bermudan Scheme to ensure that the Restructuring is recognized in the jurisdiction where Noble is incorporated, and to ensure that all Noble shareholders and creditors will be stayed from taking any adverse action under Bermudan law. This includes a wind-up of the business of Noble and its affiliates, which would be in contravention of the terms and conditions of the Restructuring. Noble has obtained an order from the Supreme Court of Bermuda, pursuant to section 99 of the Companies Act 1981 of Bermuda granting leave to convene meetings of the Scheme Creditors of Bermuda to consider and approve a Bermudan scheme of arrangement for Noble (*i.e.*, the Bermudan Scheme).

29. While the sanctioning of both the English Scheme and the Bermudan Scheme by their respective foreign courts are required conditions to Noble's Restructuring, the English Scheme and the Bermudan Scheme are parallel and inter-conditional such that they both reflect the same economic restructuring of the same outstanding obligations of Noble. As such, only recognition of the English Proceedings is being sought at this time.

---

[10] *See* Form Petition, Ex. 3, ¶ 5.

[11] *See id.* ¶ 15.

**VIII. Appointment as Foreign Representative and Filing of the Verified Petition.**

30. On October 12, 2018, the Board appointed me as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code for purposes of the English Proceedings. Concurrently, the Board authorized me to file the Verified Petition seeking recognition of the English Proceedings as foreign main proceedings or, in the alternative, as foreign nonmain proceedings under chapter 15 of the Bankruptcy Code. A copy of the applicable resolutions is attached to the Form Petition as Exhibit 2.

31. It is my understanding that, for these reasons, I satisfy the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

32. The Debtor has issued the 2020 Notes, which are governed by New York law and contain a New York forum selection clause. Additionally, the Debtor has property in the United States in the form of bank accounts maintained by JPMorgan Chase & Co. in New York, New York.

33. I filed the Verified Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this chapter 15 case in the Southern District of New York, seeking recognition of the English Proceedings as "foreign main proceedings" or, in the alternative, as "foreign nonmain proceedings," and seeking other necessary or appropriate relief in support of the English Proceedings.

34. I have been informed that the English Proceedings are "foreign proceedings" as they are a collective judicial proceeding authorized and supervised by the English Court under Part 26 of the Companies Act 2006 of England and Wales. It is my understanding that for these reasons, the English Proceedings qualify as "foreign proceedings" as that term is defined in section 101(23) of the Bankruptcy Code.

14

35. I have been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "the center of its main interests" ("COMI"). *See* 11 U.S.C. § 1517(b)(1). I have also been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign nonmain proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "an establishment." *See* 11 U.S.C. § 1517(b)(2).

36. To the best of my knowledge and belief, the English Proceedings: (a) constitute "foreign main proceedings" within the meaning of 11 U.S.C. § 1502(4), as the Debtor maintains its corporate office in London, England, which is its center of main interests, and (b) are judicial proceedings in England under English law relating to insolvency or the adjustment of debt in which the assets and affairs of the Debtor are subject to control and supervision of the English Court. More specifically, Noble's corporate office is located at 33 Cavendish Square Marylebone, London W1G 0PW United Kingdom, and is registered in England as a foreign establishment pursuant to the Overseas Companies Regulations 2009. In addition:

   a. several of the Debtor's officers are based at the London office where they approve key vendor payments, maintain the Debtor's consolidated cash management system, and exercise the Debtor's treasury functions, including management of bank accounts, cash payments, receipts, and bank lines;

   b. the Debtor has several bank accounts in England, which it uses for a number of purposes including the payment of third party fees and to fund its subsidiaries;

   c. the majority of meetings of the Board are chaired by the Debtor's executive chairman from the London office; other directors join those Board meetings in person or by conference call;

   d. meetings of the Board's audit subcommittee, the risk subcommittee, and the corporate governance subcommittee are held in London;

15

e. London has been the primary location where negotiations between the Debtor and its creditors and their advisors in relation to the Restructuring have taken place, both prior to and in the period since the execution of the RSA;

f. the Existing Notes Documents (other than the Existing 2020 Notes Indenture which is governed by New York law) are governed by English law;

g. the Existing RCF Agreement is governed by English law;

h. the RSA is governed by English law; and

i. a number of the Notes Scheme Creditors and RCF Scheme Creditors are subject to the personal jurisdiction of the English Court by virtue of having their corporate office or principal place of business in England.

37. Though the Debtor's registered office is located in Bermuda, the Debtor engages in no activities or operations there. Based on the foregoing, I believe that recognition of the English Proceedings as foreign main proceedings is warranted.

38. I also believe recognition of myself as the Debtor's "foreign representative" and recognition of the English Proceedings as "foreign main proceedings" are consistent with the purpose of chapter 15 and will allow the Debtor to restructure in the most efficient manner without jeopardizing creditors' rights.

39. For the reasons set forth in the Verified Petition, I submit that recognition of the English Proceedings is necessary and appropriate for the benefit of the Debtor, its creditors, and other parties in interest.

**IX. Statement Pursuant to Section 1515 of the Bankruptcy Code.**

40. I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

a. A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

16

      b.    A petition for recognition shall be accompanied by—

          i.    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

          ii.    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

          iii.    in the absence of evidence referred to in paragraphs (i) and (ii), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

      c.    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

41.    In satisfaction of section 1515(b) of the Bankruptcy Code, attached to the Form Petition as <u>Exhibit 2</u> and <u>Exhibit 3</u>, respectively, and incorporated herein by reference, are true and correct copies of the following documents evidencing the English Proceedings and my appointment as the Foreign Representative: (a) the resolutions appointing the Foreign Representative and (b) the Convening Order.[12] Therefore, the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code in satisfaction of the third requirement under section 1517(a) of the Bankruptcy Code.

## X.    Disclosure Pursuant to Bankruptcy Rule 1007(a)(4).

42.    I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing

---

[12] The Debtor reserves the right to supplement these materials in advance of or at the final hearing on the Verified Petition.

of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

43. I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that a corporate ownership statement:

> . . . identif[y] any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under this subdivision.

### A. Corporate Ownership Statement.

44. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the following is a corporate ownership statement of the Debtor, which identifies any corporation that directly or indirectly owns 10 percent or more of any class of the Debtor's equity interests as of August 14, 2018:

- <u>Noble Holdings Limited</u>: Noble Holdings Limited directly owns 17.9% of Noble's ordinary shares, the Debtor's only class of equity interests.

### B. Persons or Bodies Authorized to Administer Foreign Proceedings of the Debtor.

45. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtor, as directed by its board of directors, will maintain control of and be authorized to administer the English Proceedings. The service address for the Debtor is: 33 Cavendish Square Marylebone, London W1G 0PW United Kingdom. Additionally, Patrick Cowley of KPMG Advisory (Hong Kong) Limited, Michael Robert Pink of KPMG LLP, and Michael William Morrison of KPMG Advisory Limited will be appointed as Scheme Administrators, pursuant to the terms of the English Scheme. Their service address is: c/o KPMG Advisory (Hong Kong) Limited, 8th Floor, Prince's Building, 10 Chater Road, Central, Hong Kong, Attention: Patrick Cowley, Christopher Ball, Vicky Chan. I am not aware of any other persons or bodies authorized to administer the English Proceedings on behalf of the Debtor.

**C.     Pending Litigation.**

46.    The Debtor is not a party to any litigation in the United States at the time of the commencement of this chapter 15 case.

**D.     Additional Foreign Proceedings.**

47.    The Debtor is also involved in a proceeding in Bermuda.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 17th day of October 2018

_____
Paul J. Brough
Executive Chairman
Noble Group Limited